### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| YOLANDA WHITE ON BEHALF OF JOANN TATE<br>    Plaintiffs,<br><br>   vs.<br><br><br>ANGIODYNAMICS, INC.;<br>NAVILYST MEDICAL, INC.;<br>PFM MEDICAL, INC.;<br>ICU MEDICAL, INC.;<br>BECTON, DICKINSON AND COMPANY;<br>C.R. BARD, INC.;<br>BARD ACCESS SYSTEMS, INC.;<br>BARD PERIPHERAL VASCULAR, INC.<br><br>    Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES**<br><br> **(1) NEGLIGENCE**<br> **(2) DESIGN DEFECT**<br> **(3) FAILURE TO WARN**<br> **(4) BREACH OF IMPLIED WARRANTY**<br> **(5) BREACH OF EXPRESS WARRANTY**<br> **(6) FRAUDULENT CONCEALMENT**<br> **(7) OHIO'S CONSUMER SALES PRACTICES ACT**<br> **(8) WRONGFUL DEATH**<br> **(9) SURVIVAL**<br><br> **DEMAND FOR JURY TRIAL** |

### COMPLAINT

**COMES NOW** Plaintiff, Yolanda White on Behalf of Joann Tate, by and through the undersigned counsel, and for her Complaint against AngioDynamics, Inc.; Navilyst Medical, Inc.; and PFM Medical, Inc.; ICU Medical, Inc.; Becton Dickinson and Company; C.R. Bard, Inc.; Bard Access Systems, Inc.; and Bard Peripheral Vascular, Inc.;  (collectively, the "Defendants"), states and alleges as follows:

1. This is an action for damages arising out of failures relating to Defendants' design, development, testing, assembling, manufacturing, packaging, promoting, marketing, distribution, supplying, and/or selling the defective implantable vascular access device.

### PARTIES

2.      Plaintiff, Yolanda White, is an adult citizen and resident of Cuyahoga County, Ohio, and claims damages as set forth below.

3.      Plaintiff Yolanda White is the representative of Decedent Joann Tate.

4.      Defendant AngioDynamics, Inc. ("AngioDynamics") is a Delaware corporation with its principal place of business located in Latham, New York. AngioDynamics is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices.

5.      Defendant Navilyst Medical, Inc. ("Navilyst") is a Delaware corporation with its principal place of business located in Marlborough, Massachusetts. Navilyst conducts business throughout the United States, including the State of Ohio, and is a wholly owned subsidiary of AngioDynamics. Navilyst is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices.

6.      Defendant PFM Medical, Inc., is a Cologne, Germany corporation with its principal place of business located in Carlsbad, California. PFM Medical Inc. is a medical device manufacturer and distributor who conducts business throughout the United States, including the State of California. PFM Medical, Inc., is engaged in the business of developing, manufacturing, marketing, and distributing throughout the United States its medical devices, either directly or indirectly through third parties or related entities.

7.      On information and belief, ICU Medical, Inc. is a corporation organized under the laws of the State of Delaware and has a principal place of business at 951 Calle Amanecer San Clemente, CA 92673 is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices.

8.      Defendant Becton, Dickinson and Company ("BD") is a New Jersey corporation with a principal place of business at 1 Becton Drive in Franklin Lakes, New Jersey.

9.      BD is a citizen of New Jersey for diversity-of-citizenship purposes.

10.     BD is the parent company of Defendants C.R. Bard; Bard Access Systems, Inc.; and Bard Peripheral Vascular, Inc.

11.     BD conducts business throughout the United States, including the State of Arizona.

12.     At all relevant times, BD has been engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including Bard IPCs, to be implanted in patients throughout the United States, including Plaintiff's state of residence, implant, and/or injury.

13.     Defendant C.R. Bard, Inc. ("C.R. Bard") is a New Jersey corporation with its principal place of business located at 1 Becton Drive in Franklin Lakes, New Jersey. 18. C.R. Bard is a citizen of New Jersey for diversity-of-citizenship purposes.

14.     C.R. Bard is a wholly-owned subsidiary of BD.

15.     C.R. Bard conducts business throughout the United States, including the State of Arizona.

3

16.     At all relevant times, C.R. Bard has been engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including Bard IPCs, to be implanted in patients throughout the United States, including the State of Arizona and Plaintiffs' respective states of residence, implant, and/or injury.

17.     Defendant Bard Access Systems, Inc. ("BAS") is a Utah corporation with its principal place of business located at 605 North 5600 West in Salt Lake City, Utah.

18.     BAS is a citizen of Utah for diversity-of-citizenship purposes.

19.     BAS is a wholly-owned subsidiary of BD.

20.     BAS is a wholly-owned subsidiary of C.R. Bard, Inc.

21.     BAS operates under the business trade name C.R. Bard, Inc.

22.     According to Defendants, BAS was or "is the principal manufacturer and distributor" of Bard IPCs.

22.     BAS conducts business throughout the United States, including the State of Arizona.

23.     At all relevant times, BAS has been engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including Bard IPCs, to be implanted in patients throughout the United States, including the State of Arizona and Plaintiffs' states of residence, implant, and/or injury.

24.     Defendant Bard Peripheral Vascular, Inc. ("BPV") is an Arizona corporation with its principal place of business located at 1625 West 3rd Street in Tempe, Arizona.

4

25. BPV is a citizen of Arizona for diversity-of-citizenship purposes.

26. BPV is a wholly-owned subsidiary of BD.

27. BPV is a wholly-owned subsidiary of C.R. Bard, Inc.

28. BPV operates under the business trade name C.R. Bard, Inc.

29. BPV operates under the business trade name SenoRx, Inc.

30. According to Defendants, BPV "distributed" Bard IPCs.

31. BPV conducts business throughout the United States, including the State of Ohio.

32. At all relevant times, BPV has been engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including Bard IPCs, to be implanted in patients throughout the United States, including Plaintiff's state of residence, implant, and/or injury.

### *BD Acquires C.R. Bard, BAS, and BPV*

33. On or about April 23, 2017, BD entered into a Merger Agreement under which BD would acquire C.R. Bard and its subsidiaries, BAS and BPV.

34. On or about December 29, 2017, BD completed its acquisition of C.R. Bard and its subsidiaries, BAS and BPV.

35. Under the terms of the agreement, C.R. Bard shareholders received approximately $222.93 in cash and 0.5077 shares of BD stock per share of C.R. Bard common stock.

36. C.R. Bard shares ceased trading and were delisted from the New York Stock Exchange.

37. Upon information and belief, C.R. Bard transferred all or substantially all of its assets to BD.

38. Upon information and belief, BAS transferred all or substantially all of its assets to BD.

39. Upon information and belief, BPV transferred all or substantially all of its assets to BD.

40. C.R. Bard's business units and subsidiaries, including BAS and BPV, were integrated into and subsumed into BD's business units.

41. C.R. Bard's product offerings were taken over by and integrated into BD's Interventional and Medical segments.

42. BAS's product offerings were taken over by and integrated into BD's Interventional and Medical segments.

43. BPV's product offerings were taken over by and integrated into BD's Interventional and Medical segments.

44. BD created the new Interventional segment to include a majority of C.R. Bard, BAS, and BPV product offerings, including Bard IPCs.

45. C.R. Bard reports both operationally and financially to BD's Interventional segment.

46. BAS reports both operationally and financially to BD's Interventional segment.

47. BPV reports both operationally and financially to BD's Interventional segment.

48. Following the acquisition, C.R. Bard's Board of Directors dissolved.

49. Some of C.R. Bard's former directors joined BD's Board of Directors. a. C.R. Bard's Former Chairman and Chief Executive Officer Timothy M. Ring, for example, joined BD's Board of Directors.

50. After the acquisition, approximately 16,000 employees of C.R. Bard, BAS, and

BPV became BD employees.

a. C.R. Bard's Chief Human Resources Officer Betty Larson became BD's Senior Vice President of Human Resources for BD's Interventional segment and later became BD's Executive Vice President and Chief Human Resources Officer.

b. C.R. Bard's Senior Vice President, General Counsel and Corporate Secretary Samrat S. Khichi became BD's Executive Vice President and General Counsel.

51.     In 2021, BD merged the legacy C.R. Bard pension plan with the BD defined benefit cash balance pension plan.

52.     On information and belief, BD acquired C.R. Bard's liabilities, including its liabilities for any legal claims regarding Bard IPCs.

53.     Today, BD is the parent company of C.R. Bard, BAS, and BPV.

54.     "BD," "C.R. Bard," "BAS, "BPV," and "Defendants" include any and all parent companies, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind; their predecessors, successors, and assigns; their officers, directors, employees, agents, representatives; and any and all other persons acting on their behalf.

***Liability of BD for C.R. Bard's Conduct***

55.     BD is the corporate parent of C.R. Bard.

56.     BD is liable for C.R. Bard's past conduct regarding Bard IPCs, including C.R. Bard's conduct prior to BD's acquisition of C.R. Bard.

57.     BD is liable for C.R. Bard's past conduct regarding Bard IPCs, including C.R. Bard's conduct subsequent to BD's acquisition of C.R. Bard to present day.

58.     BD is also liable for C.R. Bard's future conduct regarding Bard IPCs.

59.     C.R. Bard is an alter ego of BD in that BD exercises complete domination and

control over C.R. Bard.

60. At all relevant times, a unity of interest in ownership existed between BD and C.R. Bard such that any individuality or separateness between them has ceased.

61. After the acquisition, approximately 16,000 employees of C.R. Bard, BAS, and BPV became BD employees.

62. C.R. Bard's Chief Human Resources Officer Betty Larson became BD's Senior Vice President of Human Resources for BD's Interventional segment and later became BD's Executive Vice President and Chief Human Resources Officer.

63. C.R. Bard's Senior Vice President, General Counsel and Corporate Secretary Samrat S. Khichi became BD's Executive Vice President and General Counsel.

64. In 2021, BD merged the legacy C.R. Bard pension plan with the BD defined benefit cash balance pension plan.

65. On information and belief, BD acquired C.R. Bard's liabilities, including its liabilities for any legal claims regarding Bard IPCs.

66. Today, BD is the parent company of C.R. Bard, BAS, and BPV.

67. "BD," "C.R. Bard," "BAS, "BPV," (hereinafter "the Bard Defendants") include any and all parent companies, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind; their predecessors, successors, and assigns; their officers, directors, employees, agents, representatives; and any and all other persons acting on their behalf.

### *Liability of BD for C.R. Bard's Conduct*

68. BD is the corporate parent of C.R. Bard.

69. BD is liable for C.R. Bard's past conduct regarding Bard IPCs, including C.R.

Bard's conduct prior to BD's acquisition of C.R. Bard.

70. BD is liable for C.R. Bard's past conduct regarding Bard IPCs, including C.R. Bard's conduct subsequent to BD's acquisition of C.R. Bard to present day.

71. BD is also liable for C.R. Bard's future conduct regarding Bard IPCs.

72. C.R. Bard is an alter ego of BD in that BD exercises complete domination and control over C.R. Bard.

73. At all relevant times, a unity of interest in ownership existed between BD and C.R. Bard such that any individuality or separateness between them has ceased.

74. BD and C.R. Bard are the alter ego of one another.

75. At all relevant times, BD and C.R. Bard were the agent, servant, employee, and/or joint venturer of one another.

76. At all relevant times, BD and C.R. Bard were each acting in the full course, scope, and authority of said agency, service, employment, and/or joint venture.

77. BD has completely integrated C.R. Bard's assets, liabilities, and operations into its own such that BD and C.R. Bard have ceased to function as separate corporate entities.

78. After BD acquired C.R. Bard, BD held itself out as the continuation of C.R. Bard.

79. For example, BD held itself out as the continuation of C.R. Bard through C.R. Bard's website by:

    a. Displaying both BD and C.R. Bard's logos;

    b. Representing to the public that "Bard has joined BD";

    c. Listing C.R. Bard's corporate headquarters as "Becton, Dickinson and Company, 1 Becton Drive, Franklin Lakes, NJ 07417-1880"; and

    d. Stating the website was copyrighted by "BD."

80. For example, BD has reported that it was "defending approximately 4,485 product liability claims involving [its] line of inferior vena cava filters" in MDL 2641 against C.R. Bard, even though BD was not a named defendant in that MDL.

81. For example, BD has reported that it "was sued … in a case captioned AngioDynamics, Inc. v. C.R. Bard."

82. According to BD, it obtained "a complete defense verdict" in that case against AngioDynamics, Inc., even though BD was not a named defendant in that suit.

83. BD's control over C.R. Bard has been purposefully used to perpetrate the violation of various legal duties in contravention of Plaintiffs' legal rights.

84. Adherence to the fiction that BD and C.R. Bard are distinct entities would permit an abuse of the corporate privilege, sanction fraud, and promote injustice.

85. As a result of its abuse of the corporate form as to C.R. Bard, BD is liable for Plaintiffs' damages.

### *Liability of BD for BAS's Conduct*

86. BD is the corporate parent of BAS.

87. BD is liable for BAS's past conduct regarding Bard IPCs, including BAS's conduct prior to BD's acquisition of BAS.

88. BD is liable for BAS's past conduct regarding Bard IPCs, including BAS's conduct subsequent to BD's acquisition of BAS to present day.

89. BD is also liable for BAS's future conduct regarding Bard IPCs.

90. BAS is an alter ego of BD in that BD exercises complete domination and control over BAS.

91. At all relevant times, a unity of interest in ownership existed between BD and BAS

such that any individuality or separateness between them has ceased.

92.     BD and BAS are the alter ego of one another.

93.     At all relevant times, BD and BAS were the agent, servant, employee, and/or joint venturer of one another.

94.     At all relevant times, BD and BAS were each acting in the full course, scope, and authority of said agency, service, employment, and/or joint venture.

95.     BD has completely integrated BAS's assets, liabilities, and operations into its own such that BD and BAS have ceased to function as separate corporate entities.

96.     After BD acquired BAS, BD held itself out as the continuation of BAS.

97.     For example, BD held itself out as the continuation of BAS through BAS's website by:

     a.  Displaying both BD and Bard's logos alongside BAS's name;

     b.  Representing that "Bard has joined BD"; and

     c.  Stating the website was copyrighted by "BD."

98.     Today, BAS's former website redirects to BD's website.

99.     For example, BD has reported that it "was sued … in a case captioned AngioDynamics, Inc. v. [BAS]."

100.    According to BD, it achieved "a complete defense verdict" in that case against AngioDynamics, Inc., even though BD was not a named defendant in that suit.13

101.    BD's control over BAS has been purposefully used to perpetrate the violation of various legal duties in contravention of Plaintiffs' legal rights.

102.    Adherence to the fiction that BD and BAS are distinct entities would permit an abuse of the corporate privilege, sanction fraud, and promote injustice.

103.    As a result of its abuse of the corporate form as to BAS, BD is liable for Plaintiffs' damages.

***Liability of BD for BPV's Conduct***

104.    BD is the corporate parent of BPV.

105.    BD is liable for BPV's past conduct regarding Bard IPCs, including BPV's conduct prior to BD's acquisition of BPV.

106.    BD is liable for BPV's past conduct regarding Bard IPCs, including BPV's conduct subsequent to BD's acquisition of BPV to present day.

107.    BD is liable for BPV's future conduct regarding Bard IPCs.

108.    BPV is an alter ego of BD in that BD exercises complete domination and control over BPV.

109.    At all relevant times, a unity of interest in ownership existed between BD and BPV such that any individuality or separateness between them has ceased.

110.    BD and BPV are the alter ego of one another.

111.    At all relevant times, BD and BPV were the agent, servant, employee, and/or joint venturer of one another.

112.    At all relevant times, BD and BPV were each acting in the full course, scope, and authority of said agency, service, employment, and/or joint venture.

113.    BD has completely integrated BPV's assets, liabilities, and operations into its own such that BD and BPV have ceased to function as separate corporate entities.

114.    After BD acquired BPV, BD held itself out as the continuation of BPV.

115.    For example, BD held itself out as the continuation of BPV through BPV's website by:

12

a. Displaying both BD and Bard's logos alongside BPV's name;

b. Representing that "Bard has joined BD"; and

c. Stating the website was copyrighted by "BD."

116. For example, BD has reported that it was "defending approximately 4,485 product liability claims involving [its] line of inferior vena cava filters" in MDL 2641 against BPV, even though BD was not a named defendant in that MDL.

117. BD's control over BPV has been purposefully used to perpetrate the violation of various legal duties in contravention of Plaintiffs' legal rights.

118. Adherence to the fiction that BD and BPV are distinct entities would permit an abuse of the corporate privilege, sanction fraud, and promote injustice.

119. As a result of its abuse of the corporate form as to BPV, BD is liable for Plaintiffs' damages.

120. ***Liability of C.R. Bard for BAS and BPV's Conduct***

121. To the extent BD is not liable as alleged above, C.R. Bard is liable for Plaintiffs' damages.

122. C.R. Bard is liable for BAS's past conduct regarding Bard IPCs, including BAS's conduct prior to BD's acquisition of BAS.

123. C.R. Bard is liable for BAS's past conduct regarding Bard IPCs, including BAS's conduct subsequent to BD's acquisition of BAS to present day.

124. C.R. Bard is also liable for BAS's future conduct regarding Bard IPCs.

125. C.R. Bard is liable for BPV's past conduct regarding Bard IPCs, including BPV's conduct prior to BD's acquisition of BPV.

126. C.R. Bard is liable for BPV's past conduct regarding Bard IPCs, including BPV's

conduct subsequent to BD's acquisition of BPV to present day.

127. C.R. Bard is liable for BPV's future conduct regarding Bard IPCs.

*Liability of BAS*

128. To the extent BD and/or C.R. Bard are not liable as alleged above, BAS is liable for Plaintiffs' damages.

129. BAS is liable for BAS's past conduct regarding Bard IPCs, including BAS's conduct prior to BD's acquisition of BAS.

130. BAS is liable for BAS's past conduct regarding Bard IPCs, including BAS's conduct subsequent to BD's acquisition of BAS to present day.

131. BAS is also liable for BAS's future conduct regarding Bard IPCs.

*Liability of BPV*

132. To the extent BD and/or C.R. Bard are not liable as alleged above, BPV is liable for Plaintiffs' damages.

133. BPV is liable for BPV's past conduct regarding Bard IPCs, including BPV's conduct prior to BD's acquisition of BPV.

134. BPV is liable for BPV's past conduct regarding Bard IPCs, including BPV's conduct subsequent to BD's acquisition of BPV to present day.

135. BPV is liable for BPV's future conduct regarding Bard IPCs.

**JURISDICTION AND VENUE**

136. This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and cost.

137. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 by virtue of the facts

that (a) a substantial part of the events or omissions giving rise to the claims occurred in this District, and (b) Defendants' products are produced, sold to, and consumed by individuals in the State of Ohio, thereby subjecting Defendants to personal jurisdiction in this action and making them all "residents" of this judicial District.

138. Defendants have and continue to conduct substantial business in the State of Ohio and in this District, distribute vascular access products in this District, receive substantial compensation and profits from sales of vascular access products in this District, and made material omissions and misrepresentations and breaches of warranties in this District, so as to subject them to in personam jurisdiction in this District.

139. Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, this Court has in personam jurisdiction over Defendants because Defendants are present in the State of Ohio, such that requiring an appearance does not offend traditional notices of fair and substantial justice.

## PRODUCT BACKGROUND

A. AngioDynamics Products

140. Defendants' AngioDynamics, Navilyst Medical, Inc., and PFM Medical, Inc., (hereinafter, the "AngioDyamic Defendants") Vascular Access Devices were designed, patented, manufactured, labeled, marketed, sold, and distributed by the Defendants at all relevant times herein.

141. According to the AngioDynamics Defendants, the totally implantable vascular access devices are designed to provide repeated access to the vascular system for the delivery of medication, intravenous fluids, parenteral nutrition solutions, and blood products.

142. The intended purpose of the AngioDynamics ports is to make it easier to deliver

15

medications directly into the patient's bloodstream. The device is surgically placed completely under the skin and left implanted.

143. Powerports are a system consisting of two primary components: an injection port and a polyurethane catheter which includes additives intended to make it radiopaque.

144. The injection port has a raised center, or "septum," where the needle is inserted for delivery of the medication. The medication is carried from the port into the bloodstream through a small, flexible tube, called a catheter, that is inserted into a blood vessel.

145. The powerport is indicated for patient therapies requiring repeated access to the vascular system. The port system can be used for infusion of medications, I.V. fluids, parenteral nutrition solutions, blood products, and for the withdrawal of blood samples.

146. The product's catheter is comprised of a polymeric mixture of polyurethane and a barium sulfate radiopacity agent.

147. Barium sulfate is known to contribute to reduction of the mechanical integrity of polyurethane in vivo as the particles of barium sulfate dissociate from the surface of the catheter over time, leaving microfractures and other alterations of the polymeric structure and degrading the mechanical properties of the polyurethane. Researchers have shown that catheter surface degradation in products featuring a radiopaque barium sulfate stripe is concentrated at the locus of the stripe.[1]

148. The mechanical integrity of a barium sulfate-impregnated polyurethane is affected by the concentration of barium sulfate as well as the heterogeneity of the modified polymer.

149. Upon information and belief, the Defendants' manufacturing process in designing and constructing the catheter implanted in Plaintiff involved too high a concentration of barium

---

[1] See Hecker JF, Scandrett LA. Roughness and thrombogenicity of the outer surfaces of intravascular catheters. *J Biomed Mater Res*. 1985;19(4):381-395. doi:10.1002/jbm.820190404

sulfate particles for the polymer formulation, leading to improperly high viscosity of the admixed polyurethane before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix.

150.    This improper mixing led to pockets of barium sulfate and entrapped air being distributed through the catheter body and on the inner and outer surfaces of same.

151.    This defect in the manufacturing process led to a heterogeneous modified polymer which led to an irregular catheter surface replete with fissure, pits and cracks.

152.    The roughened catheter surface leads to the collection and proliferation of fibrinous blood products, thereby drastically increasing the risk of infection.

153.    Although the surface degradation and resulting risk of thromboembolism can be reduced or avoided with design modifications to encapsulate the radiopaque compound or by using a different polymer formulation, the Defendants elected not to incorporate those design elements into the powerport.

154.    At all times relevant, the Defendants misrepresented the safety of the powerport system, and negligently designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold the powerport system as safe and effective device to be surgically implanted to provide repeated access to the vascular system for the delivery of medications, intravenous fluids, parenteral nutrition solutions, and blood products.

155.    At all times relevant to this action, the Defendants knew and had reason to know, that the powerport was not safe for the patients for whom they were prescribed and implanted, because once implanted the device was prone to surface degradation and resulting thromboembolism, infection, mechanical failure, and a variety of other complications.

156.    At all times relevant to this action, the Defendants knew and had reason to know

that patients implanted with a powerport had an increased risk of suffering life threatening injuries, including but not limited to: death; hemorrhage; thromboembolism; infection; cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart); cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; and perforations of tissue, vessels and organs, or the need for additional surgeries to remove the defective device.

157.    Soon after the powerport was introduced to market, which was years before Plaintiff was implanted with her device, the Defendants began receiving large numbers of adverse event reports ("AERs") from health care providers reporting that the powerport was fracturing post-implantation and that fractured pieces were migrating throughout the human body, including to the heart and lungs. The Defendants also received large numbers of AERs reporting that the powerport was found to have perforated internal vasculature. These failures were often associated with reports of severe patient injuries such as:

    a.    hemorrhage.

    b.    infection/sepsis;

    c.    cardia/pericardial tamponade;

    d.    cardiac arrhythmia and other symptoms similar to myocardial infarction;

    e.    severe and persistent pain;

    f.    perforations of tissue, vessels and organs; and

    g.    upon information and belief, even death.

158.    In addition to the large number of AERs which were known to the Defendants and reflected in publicly accessible databases, there are many recorded device failures and/or injuries related to the Defendants' implantable port products which were concealed from medical

18

professionals and patients through submission to the FDA's controversial Alternative Summary Reporting ("ASR") program.

159. The FDA halted the ASR program after its existence was exposed by a multi-part investigative piece, prompting a widespread outcry from medical professionals and patient advocacy groups.2

160. Prior to the discontinuation of the ASR program, the Defendants reported numerous episodes of failures of their implanted port/catheter products – including episodes of thromboembolism – under the ASR exemption, thereby concealing them from physicians and patients.

161. The Defendants were aware or should have been aware that the powerport had a substantially higher failure rate than other similar products on the market, yet the AngioDynamics Defendants failed to warn consumers of this fact.

162. The Defendants also intentionally concealed the severity of complications caused by the powerport and the likelihood of these events occurring.

163. Rather than alter the design of the powerport to make it safer or adequately warn physicians of the dangers associated with the powerport, the Defendants continued to actively and aggressively market the powerport as safe, despite their knowledge of numerous reports of thromboembolism and associated injuries.

164. Moreover, the Defendants concealed—and continue to conceal—their knowledge of the powerport's dangerous propensity to precipitate thromboembolism. The Defendants further concealed their knowledge that the catheter design caused these failures and that these failures

---

2 Christina Jewett, *Hidden Harm: Hidden FDA Reports Detail Harm Caused by Scores of Medical Devices*, Kaiser Health News (Mar. 2019)

cause serious injuries.

165.    The conduct of the Defendants, as alleged in this Complaint, constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of Plaintiff.   The Defendants had actual knowledge of the dangers presented by the powerport, yet consciously failed to act reasonably to:

      a.    Adequately inform or warn Plaintiff, her prescribing physicians, or the public at large of these dangers;

166.    Establish and maintain an adequate quality and post-market surveillance system; or

167.    Recall the powerport from the market.

**B.  ICU Medical Inc. Products**

168.    In or about May 17, 2006, Smiths Medical Md, Inc.. received clearance via the 510(k) Premarket Notification Program from the Food and Drug Administration (FDA) to market and sell a product called Port-a-Cath II.

169.    On or about January 6, 2022, ICU Medical Inc. completed the acquisition of Smith Medical including the vascular access devices designed and manufactured by Smith's Medical.

170.    ICU Medical Inc.'s Vascular Access Devices were designed, patented, manufactured, labeled, marketed, sold, and distributed by the ICU Medical Inc. at all relevant times herein.

171.    The Port-A-Cath II is one of several varieties of port/catheter systems that has been designed, manufactured, marketed, and sold by ICU Medical Inc.

172.    According to ICU Medical Inc., the Port-A-Cath II is a totally implantable vascular access device designed to permit repeated access to the venous system for the parenteral delivery of medications, fluids, and nutritional solutions and for the sampling of venous blood.

173. The intended purpose of the Port-A-Cath II is to make it easier to deliver medications directly into the patient's bloodstream. The device is surgically placed completely under the skin and left implanted.

174. The Port-A-Cath II is a system consisting of two primary components: an injection port and a polyurethane catheter which includes additives intended to make it radiopaque.

175. The injection port has a raised center, or "septum," where the needle is inserted for delivery of the medication. The medication is carried from the port into the bloodstream through a small, flexible tube, called a catheter, that is inserted into a blood vessel.

176. The Port-A-Cath II is indicated for patient therapies requiring repeated access to the vascular system. The port system can be used for infusion of medications, I.V. fluids, parenteral nutrition solutions, blood products, and for the withdrawal of blood samples.

177. The product's catheter is comprised of a polymeric mixture of polyurethane and a barium sulfate radiopacity agent.

178. Barium sulfate is known to contribute to reduction of the mechanical integrity of polyurethane in vivo as the particles of barium sulfate dissociate from the surface of the catheter over time, leaving microfractures and other alterations of the polymeric structure and degrading the mechanical properties of the polyurethane.

179. Researchers have shown that catheter surface degradation in products featuring a radiopaque barium sulfate stripe is concentrated at the locus of the stripe.[3]

180. The design of the product at issue in this case includes a catheter with a stripe containing a stripe with a higher concentration of barium sulfate than the rest of the catheter.

181. According to relevant medical literature, such design is proven to have a higher rate

---

[3] See Hecker JF, Scandrett LA. Roughness and thrombogenicity of the outer surfaces of intravascular catheters. *J Biomed Mater Res*. 1985;19(4):381-395. doi:10.1002/jbm.820190404

of fracture than catheters without the barium-loaded stripe.

182. The mechanical integrity of a barium sulfate-impregnated polyurethane is affected by the concentration of barium sulfate as well as the heterogeneity of the modified polymer.

183. Upon information and belief, ICU Medical Inc.'s manufacturing process in designing and constructing the catheter implanted in Plaintiff involved too high a concentration of barium sulfate particles for the polymer formulation, leading to improperly high viscosity of the admixed polyurethane before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix.

184. This defect in the manufacturing process led to a heterogeneous modified polymer which led to an irregular catheter surface replete with fissure, pits and cracks as well as sections of the catheter lumen which contain more than 30% barium sulfate by weight, reducing the catheter strength at those loci.

185. The roughened catheter surface leads to the collection and proliferation of fibrinous blood products, thereby drastically increasing the risk of biofilm, infection, and sepsis.

186. Although the surface degradation and resultant mechanical failure can be reduced or avoided with design modifications (e.g., using a higher grade radiopacity compound and/or encapsulating the admixed polymer within polyurethane), ICU Medical Inc. elected not to incorporate those design elements into the Port-A-Cath II.

187. At all times relevant, ICU Med misrepresented the safety of the Port-A-Cath II system, and negligently designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold the Port-A-Cath II system as safe and effective device to be surgically implanted to provide repeated access to the vascular system for the delivery of medications, intravenous fluids, parenteral nutrition solutions, and blood products.

188.    At all times relevant to this action, ICU Medical Inc. knew and had reason to know, that the Port-A-Cath II was not safe for the patients for whom they were prescribed and implanted, because once implanted the device was prone to fracturing, perforating internal vasculature, and otherwise malfunctioning.

189.    At all times relevant to this action, ICU Medical Inc. knew and had reason to know that patients implanted with a Port-A-Cath II port had an increased risk of suffering life threatening injuries, including but not limited to: death; infection; hemorrhage; cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart); cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; and perforations of tissue, vessels and organs, or the need for additional surgeries to remove the defective device.

190.    Soon after the Port-A-Cath II was introduced to market, which was years before Plaintiff was implanted with her device, ICU Medical Inc. began receiving large numbers of adverse event reports ("AERs") from health care providers reporting that the Port-A-Cath II was fracturing post-implantation and that fractured pieces were migrating throughout the human body, including to the heart and lungs. ICU Medical Inc. also received large numbers of AERs reporting that Port-A-Cath II was found to have perforated internal vasculature. These failures were often associated with reports of severe patient injuries such as:

a.  hemorrhage.

b.  infection/sepsis;

c.  cardia/pericardial tamponade;

d.  cardiac arrhythmia and other symptoms similar to myocardial infarction;

e.  severe and persistent pain;

f.  perforations of tissue, vessels and organs; and

23

g.  upon information and belief, even death.

191.    In addition to the large number of AERs which were known to ICU Medical Inc. and reflected in publicly accessible databases, there are many recorded device failures and/or injuries related to the ICU Medical Inc.'s implantable port products which were concealed from medical professionals and patients through submission to the FDA's controversial Alternative Summary Reporting ("ASR") program.

192.    The FDA halted the ASR program after its existence was exposed by a multi-part investigative piece, prompting a widespread outcry from medical professionals and patient advocacy groups.4

193.    Prior to the discontinuation of the ASR program, ICU Medical Inc. reported numerous episodes of failures of their implanted port/catheter products – including numerous episodes of infection – under the ASR exemption, thereby concealing them from physicians and patients.

194.    ICU Medical Inc. were aware or should have been aware that the Port-A-Cath II had a substantially higher failure rate than other similar products on the market, yet ICU Medical Inc. failed to warn consumers of this fact.

195.    ICU Medical Inc. also intentionally concealed the severity of complications caused by the Port-A-Cath II and the likelihood of these events occurring.

196.    Rather than alter the design of the Port-A-Cath II to make it safer or adequately warn physicians of the dangers associated with the Port-A-Cath II, ICU Medical Inc. continued to actively and aggressively market the Port-A-Cath II as safe, despite their knowledge of numerous

---

4 Christina Jewett, *Hidden Harm: Hidden FDA Reports Detail Harm Caused by Scores of Medical Devices*, Kaiser Health News (Mar. 2019)

24

reports of infection and associated injuries.

197. Moreover, ICU Medical Inc. concealed—and continue to conceal—their knowledge of the Port-A-Cath II's dangerous propensity to precipitate infection. ICU Medical Inc. further concealed their knowledge that the catheter design caused these failures and that these failures cause serious injuries.

198. The conduct of ICU Medical Inc., as alleged in this Complaint, constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of Plaintiff. ICU Medical Inc. had actual knowledge of the dangers presented by the Port-A-Cath II System, yet consciously failed to act reasonably to:

    a.    Adequately inform or warn Plaintiff, her prescribing physicians, or the public at large of these dangers;

    b.    Establish and maintain an adequate quality and post-market surveillance system; or

    c.    Recall the Port-A-Cath II System from the market.

## C. Bard Products

199. The Bard Defendants began designing and developing various IPCs, including some Bard IPCs, in the 1980s.

200. In addition, all Bard IPCs are "radiopaque," meaning visible during diagnostic imaging such as an X-ray, computed tomography ("CT scan"), or magnetic resonance imaging ("M.R.I.").

201. Beginning in the mid-2000s, Defendants designed and developed various "power-injectable" IPCs.

202. Power-injectable ports allow for contrast material to be injected at a higher rate than

by hand injection, facilitating medical imaging.

203.    178. Power-injectable ports were first made commercially available to the medical community in 2006.

204.    The United States Food and Drug Administration ("FDA") cleared Defendants' PowerPort Implanted Titanium Port with 8 Fr ChronoFlex Catheter on July 14, 2006 (K060812), as detailed further below.

205.    Defendants' power-injectable ports include but are not limited to the following Bard IPCs:

a. Powerport Implantable Port;
b. PowerPort isp Implantable Port;
c. PowerPort M.R.I. Implantable Port;
d. PowerPort duo M.R.I. Implantable Port;
e. PowerPort ClearVUE Slim Implantable Port;
f. PowerPort ClearVUE isp Implantable Port;
g. PowerPort isp M.R.I. Implantable Port;
h. PowerPort Slim Implantable Port;
i. Vaccess CT Power-Injectable Implantable Port;
j. Vaccess CT Low-Profile Titanium Power-Injectable Port; and
k. PowerFlow Implantable Apheresis IV Port.

206.    Regardless of the model, all Bard IPCs are comprised of a polymeric mixture containing barium sulfate.

207.    Barium sulfate reduces the mechanical integrity of polyurethane in vivo.

208.    Scientists have found that "the roughness and thrombogenicity of various catheters is associated with the presence of radiopaque particles embedded in the catheters."

209.    When exposed to the bloodstream, barium-sulfate particles dissociate from the surface of the polyurethane catheter over time.

210.    This exposure alters the catheter's polymeric structure and degrades its mechanical properties.

211.    2Scientific literature shows that when barium-sulfate impregnated catheters are "expos[ed] … to the bloodstream," it causes "[barium sulfate] particle release, resulting in surface irregularities."

212.    Thus, "it is … obvious that the choice of the material itself and subsequent degradation when exposed to the bloodstream has significant impact on catheter durability and catheter-related complications."

213.    The mechanical integrity of the barium-sulfate impregnated polyurethane is also affected by the concentration of barium sulfate.

214.    The mechanical integrity of the barium-sulfate impregnated polyurethane is further affected by the homogeneity of the modified polymer.

215.    In addition, barium sulfate reduces the mechanical integrity of silicone in vivo.

216.    When exposed to the bloodstream, the barium-sulfate particles dissociate from the surface of the silicone catheter over time.

217.    This exposure alters the catheter's polymeric structure and degrades its mechanical properties.

218.    The mechanical integrity of the barium-sulfate impregnated silicone is also affected by the concentration of barium sulfate.

219.    The mechanical integrity of the barium-sulfate impregnated silicone is further affected by the homogeneity of the modified polymer.

220.    When the barium sulfate degrades in vivo, it causes cracks, fissures, divots, and/or pitting on the surface of the catheter.69

221.    These cracks, fissures, divots, and/or pitting on the catheter's surface can cause catheter fracture.

222.    Scientific literature shows that "the loss of barium sulphate filler particles near the surface of the catheter … results in preformed microscopic notches, which act as predetermined sites of fracture" and "complete mechanical failure."[70]

223.    These cracks, fissures, divots, and pitting on the surface of the catheter can also harbor microbes.

224.    Microbes on the surface of the catheter can cause infection.

225.    Scientific literature shows that "[barium sulfate] particle release result[s] in surface irregularities predisposing to bacterial proliferation."[71]

226.    Due to "continuous contact of the catheter with the tissues and the patient fluids," a biofilm is formed on the catheter, "which is a perfect environment for the development of infection."[72]

227.    "[S]urface roughness" further "leads to enhanced bacterial colonization by providing shelter."[73]

228.    Cracks, fissures, divots, and/or pitting on the surface of the catheter can also cause thrombosis by permitting the collection and proliferation of fibrinous material present in the bloodstream.

229.    Indeed, "roughness of the catheter surface … promotes thrombogenicity."[74]

230.    Additionally, collection of fibrinous material on the surface of a biomaterial potentiates infection by creating a hospitable surface environment for pathogens including bacteria and fungi.

231.    In sum, "[IPC] implantations are associated with risk of infection and of thrombovascular, mechanical, and arrhythmogenic complications."[75]

232.    "Surface irregularities resulting from the release of [barium sulfate] may represent

a common causative pathway for these complications" and many others.76

233.     Because Bard IPCs' catheters are not sheathed or otherwise coated, the barium sulfate on the catheter's surface contacts the patient's bloodstream.

234.     Bard IPCs' labeling, including but not limited to the instructions for use, failed to warn about the fact that Bard IPCs' catheters were comprised of a polymeric mixture containing barium sulfate.

235.     Defendants otherwise concealed and failed to warn about the fact that Bard IPCs' catheters were comprised of a polymeric mixture containing barium sulfate.

236.     Bard IPCs' labeling, including but not limited to the instructions for use, failed to warn about the fact that barium sulfate disassociates from the catheter surface in vivo.

237.     Defendants otherwise concealed and failed to warn about the fact that barium sulfate disassociates from the catheter surface in vivo.

238.     Bard IPCs' labeling, including but not limited to the instructions for use, failed to warn about the fact that when barium sulfate disassociates, it causes injury, including but not limited to catheter fracture, infection, and thrombosis.

239.     Defendants otherwise concealed and failed to warn about the fact that when barium sulfate disassociates, it causes injury, including but not limited to catheter fracture, infection, and thrombosis.

### SPECIFIC FACTUAL ALLEGATIONS AS TO PLAINTIFFS

240.     On or about February 2021, Decedent Joann Tate underwent placement of a port.

241.     Defendants, directly or through their agents, apparent agents, servants, or employees designed, manufactured, marketed, advertised, distributed, and sold the port that was implanted in Plaintiff.

29

242. Defendants manufactured, sold, and/or distributed the port to Plaintiff, through her doctors, to be used for vein access.

243. Plaintiff presented to the Cleveland Clinic in Warrensville Heights, Ohio with shortness of breath, and the doctors determined that she had a port infection.

244. The port infection caused her lungs to fill up with fluid and causing her sickness, and the doctors removed her port immediately after this discovery, on or about March 15, 2023.

245. Decedent Joann Tate passed away on March 20, 2023.

246. At all times, the port was utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the instructions for use and created procedures for implanting the product.

247. The port implanted in Decedent was in the same or substantially similar condition as when it left the possession of Defendants and in the condition directed by and expected by Defendants.

248. Decedent and her physicians foreseeably used and implanted the port and did not misuse or alter the port in an unforeseeable manner.

249. Defendants advertised, promoted, marketed, sold, and distributed the port as a safe medical device when Defendant knew or should have known the port was not safe for its intended purposes and that the product could cause serious medical problems.

250. Defendants had sole access to material facts concerning the defective nature of the port product and its propensity to cause serious and dangerous side effects.

251. In reliance on Defendants' representations, Plaintiff's doctors were induced to, and did use the port.

252. As a result of having the port implanted, Decedent has experienced significant pain

30

and suffering, including death and has suffered financial or economic loss, including, but to limited to, obligations for medical services and expenses.

253. Defendants' port was marketed to the medical community and to patients as a safe, effective, reliable, medical devices implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, and as safer and more effective as compared to the traditional products and procedures for treatment and other competing Vascular Access Devices.

254. The Defendants have marketed and sold the Defendants' port to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, direct to consumer advertising, aggressive marketing to health care providers at medical conferences, hospitals, private offices, and/or group purchasing organizations, and include a provision of valuable consideration and benefits to the aforementioned.

255. The injuries, conditions, and complications suffered due to Defendants' port include, but are not limited to, infection; and severe and persistent pain.

256. Defendants were negligent toward Plaintiff's Decedent in the following respects:

a. Defendant failed to design and establish a safe, effective procedure for removal of the port; therefore, in the event of a failure, injury, or complications it is difficult to safely remove the port.

b. Defendants provided incomplete, insufficient, and misleading information to physicians in order to increase the number of physicians using the port for the purpose of increasing their sales. By so doing, Defendants caused the

31

dissemination of inadequate and misleading information to patients, including the Plaintiff's Decedent.

257. The port was utilized and implanted in a manner foreseeable to Defendants.

258. The port implanted into Plaintiff was in the same or substantially similar condition as when it left the possession of the Defendants and in the condition directed by the Defendants.

259. At the time of her operation, Plaintiff was not informed of, and had no knowledge of the complaints, known complications and risks associated with the port, including, but not limited to, the extent of seriousness of the danger of thromboembolism.

260. Plaintiff's Decedent was never informed by Defendants of the defective and dangerous nature of the port.

261. At the time of her implant, upon information and belief, neither Plaintiff's Decedent nor her physicians were aware of the defective and dangerous condition of the port.

262. As a result of the Defendants' actions and inactions, Plaintiff's Decedent was injured due to the use of the port, which has caused Plaintiff's Decedent's death and will continue to cause Plaintiff's various physical, mental, and emotional injuries and damages. Accordingly, Plaintiff seeks compensatory damages.

### COUNT I: NEGLIGENCE
(Against Defendants AngioDynamics, Navilyst, PFM Medical, ICU Medical Inc., Becton, Dickinson and Company; C.R. Bard, Inc.; Bard Access Systems, Inc.; Bard Peripheral Vascular, Inc.)

263. Plaintiff incorporates the preceding paragraphs as if set out fully herein.

264. The Defendants owed Plaintiff's Decedent a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, selling and conducting post-market surveillance of the port.

265. The Defendants failed to exercise due care under the circumstances and therefore

breached this duty by:

    a.  Failing to properly and thoroughly test the port before releasing the device to market, and/or failing to implement feasible safety improvements;

    b.  Failing to properly and thoroughly analyze the data resulting from any pre-market testing of the port;

    c.  Failing to conduct sufficient post-market testing and surveillance of the port;

    d.  Failing to comply with state and federal regulations concerning the study, testing, design, development, manufacture, inspection, production, advertisement, marketing, promotion, distribution, and/or sale of the port;

    e.  Designing, manufacturing, marketing, advertising, distributing, and selling the port to consumers, including Plaintiff's Decedent, without an adequate warning of the significant and dangerous risks of the port and without proper instructions to avoid the harm which could foreseeably occur as a result of using the device;

    f.  Failing to exercise due care when advertising and promoting the port; and

    g.  Negligently continuing to manufacture, market, advertise, and distribute the port after Defendants knew or should have known of its adverse effects.

266.    As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, Plaintiff's Decedent has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

267.    In performing the foregoing acts, omissions, and misrepresentations, Defendants acted grossly negligent, fraudulently, and with malice so as to justify an award of punitive and/or exemplary damages.

## COUNT II: STRICT PRODUCTS LIABILITY – DESIGN DEFECT

(Against Defendants AngioDynamics, Navilyst, PFM Medical, ICU Medical Inc., Becton, Dickinson and Company; C.R. Bard, Inc.; Bard Access Systems, Inc.; Bard Peripheral Vascular, Inc.)

268. Plaintiffs incorporate the preceding paragraphs as if set out fully herein.

269. Defendants supplied, manufactured, sold, distributed and/or otherwise placed into the stream of commerce the port implanted into Plaintiff's Decedent.

270. The port implanted in Plaintiff's Decedent was not reasonably safe for its intended use and was defective with respect to its design.

271. The port was in a defective condition and was defective in its design in that when it left the possession and control of Defendants, it was not safe for its anticipated use and safer, more reasonable alternative designs existed that could have been utilized by Defendants.

272. The port was unreasonably dangerous to the user or consumer, taking into consideration the utility of said product and the risks involved in its use. The foreseeable risks associated with the design of the product were more dangerous than a reasonably prudent consumer such as Plaintiff's Decedent and/or her physicians would expect when the product was used for its normal and intended purpose.

273. The port was expected to and did reach the consumer without substantial change in the condition in which it was supplied, distributed, sold and/or otherwise placed into the stream of commerce.

274. A reasonably prudent medical device manufacturer would have recognized the defective design of the port and not placed it into the stream of commerce.

275. The design defects in the port were not known, knowable and/or reasonably apparent to Plaintiff and/or her physician or discoverable upon any reasonable examination.

276. The port was used and implanted in the manner in which it was intended to be used

34

and implanted by Defendants pursuant to the instructions for use and the product specifications provided by Defendants.

277. Defendants are strictly liable to the Plaintiff's Decedent for designing, manufacturing, marketing, labeling, packaging and selling a defective product.

278. As a direct, actual, and proximate cause of the port's aforementioned defects, the Plaintiff was caused and/ or in the future will be caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

## COUNT III: STRICT PRODUCTS LIABILITY – FAILURE TO WARN
(Against Defendants AngioDynamics, Navilyst, PFM Medical, ICU Medical Inc., Becton, Dickinson and Company; C.R. Bard, Inc.; Bard Access Systems, Inc.; Bard Peripheral Vascular, Inc.)

279. Plaintiffs incorporate the preceding paragraphs as if set out fully herein.

280. Defendants designed, set specifications, manufactured, assembled, processed, marketed, labeled, distributed, and sold the port, including the one implanted in Plaintiff's Decedent, into the stream of commerce and in the course of the same, directly advertised and marketed the device to consumers or persons responsible for consumers, and therefore had a duty to warn of the risk of harm associated with the use of the device and to provide adequate instructions on the safe and proper use of the device.

281. At the time Defendants designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the device into the stream of commerce, the device was defective and presented a substantial danger to users of the product when put to its intended and reasonably anticipated use, namely as an implanted port/catheter system to administer intravenous fluids and/or medications. Defendants failed to adequately warn of the device's known or reasonably scientifically knowable dangerous propensities, and further

35

failed to adequately provide instructions on the safe and proper use of the device.

282. Defendants knew or should have known at the time they manufactured, labeled, distributed, and sold the port that was implanted into Plaintiff's Decedent that the port posed a significant and higher risk than other similar devices of device failure and resulting serious injuries.

283. Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of the port; no reasonable health care provider, including Plaintiff's Decedent's, or patient would have used the device in the manner directed, had those facts been made known to the prescribing healthcare providers or the consumers of the device.

284. The warnings, labels, and instructions provided by Defendants at all times relevant to this action, are and were inaccurate, intentionally misleading, and misinformed and misrepresented the risks and benefits and lack of safety and efficacy associated with the device.

285. The health risks associated with the device as described herein are of such a nature that ordinary consumers would not have readily recognized the potential harm.

286. The port, which was designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold into the stream of commerce by Defendants, was defective at the time of release into the stream of commerce due to inadequate warnings, labeling and/or instructions accompanying the product.

287. When Plaintiff's Decedent was implanted with the device, Defendants failed to provide adequate warnings, instructions, or labels regarding the severity and extent of health risks posed by the device, as discussed herein.

288. Defendants intentionally underreported the number and nature of adverse events associated with infection of the devices to Plaintiff's Decedent's health care providers, as well as the FDA.

36

289. Upon information and belief, neither Plaintiff's Decedent nor her health care providers knew of the substantial danger associated with the intended and foreseeable use of the device as described herein.

290. Plaintiff's Decedent and her health care providers used the port in a normal, customary, intended, and foreseeable manner, namely as a surgically placed device used to make it easier to deliver medications directly into the patient's bloodstream.

291. Upon information and belief, the defective and dangerous condition of the port, including the one implanted into Plaintiff's Decedent, existed at the time they were manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold by Defendants to distributors and/or healthcare professionals or organizations.

292. Upon information and belief, the port implanted in Plaintiff's Decedent was in the same condition as when it was manufactured, inspected, marketed, labeled, promoted, distributed and sold by Defendants.

293. Defendants' lack of sufficient warning and/or instructions was the direct and proximate cause of Plaintiff's Decedent serious physical injuries including death, and economic damages in an amount to be determined at trial. Had Defendants provided adequate warnings, Plaintiff's Decedent and her physicians would not have used the port.

294. As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, Plaintiff's Decedent has been injured and has sustained economic and non-economic damages, both in the past and future, including for pain and suffering and medical expenses.

295. In performing the foregoing acts, omissions, and misrepresentations, Defendants acted grossly negligent, fraudulently, and with malice so as to justify an award of punitive and/or

exemplary damages.

## COUNT IV: BREACH OF IMPLIED WARRANTY
(Against Defendants AngioDynamics, Navilyst, PFM Medical, ICU Medical Inc., Becton, Dickinson and Company; C.R. Bard, Inc.; Bard Access Systems, Inc.; Bard Peripheral Vascular, Inc.)

296.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

297.    Defendants impliedly warranted that the port was merchantable and fit for the ordinary purposes for which it was intended.

298.    When the port was implanted in the Plaintiff's Decedent, it was being used for the ordinary purposes for which it was intended.

299.    The Plaintiff's Decedent, individually and/or by and through her physician, relied upon Defendants' implied warranties of merchantability in consenting to have the port implanted in her.

300.    Privity exists between Plaintiff's Decedent because Plaintiff's physicians acted as Plaintiff's purchasing agents in the subject transaction and/or because Plaintiff was a third-party beneficiary of the subject contract.

301.    Plaintiff's Decedent was the intended consumer of the device when Defendant made the warranties set forth herein, and such warranties were made to benefit Plaintiff's Decedent as a patient and consumer.

302.    Defendants breached these implied warranties of merchantability because the port implanted in Plaintiff was neither merchantable nor suited for its intended uses as warranted in that the device varied from its intended specifications, which included, but are not limited to, variances in the following respects:

303.    Defendants' manufacturing process in constructing the catheter of the port implanted in Plaintiff involved too high of a concentration of barium sulfate particles for the

polymer formulation, which led to improperly high viscosity of the admixed polyurethane before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix;

304.    Defendants knew or should have known barium sulfate is known to contribute to a reduction in the mechanical integrity of the polyurethane in its product, the port, as the barium sulfate particles dissociate from the surface of the catheter over time; and

a.    These defects led to a heterogenous modified polymer that included microfractures and weakened areas at the location of the higher barium sulfate concentration that ultimately led to the collection and proliferation of blood products, thereby drastically increasing the risk of thromboembolism.

305.    Defendants' breaches of their implied warranties resulted in the implantation of an unreasonably dangerous and defective product, the port, into Plaintiff's body, placing said Plaintiff's health and safety in jeopardy.

306.    The port was sold to Plaintiff's Decedent's  health care providers for implantation in patients, such as Plaintiff's Decedent.

307.    As a direct, actual, and proximate cause of the Defendants' breaches of the aforementioned implied warranties, the Plaintiff as caused and/or in the future will be caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, including but not limited to, obligations for medical services and expenses, and other damages.

308.    Upon information and belief, Plaintiff's Decedent's healthcare providers sent notice to Defendants of the adverse event that occurred to Plaintiff and thus, the nonconformity of the port, within a reasonable period of time following discovery of the breach of warranty and

39

before suit was filed.

### COUNT V: BREACH OF EXPRESS WARRANTY

(Against Defendants AngioDynamics, Navilyst, PFM Medical, ICU Medical Inc., Becton, Dickinson and Company; C.R. Bard, Inc.; Bard Access Systems, Inc.; Bard Peripheral Vascular, Inc.)

309.    Plaintiffs incorporate the preceding paragraphs as if set out fully herein.

310.    Defendants through their officers, directors, agents, representatives, and written literature and packaging, and written and media advertisement, expressly warranted that the port was safe and fit for use by consumers, was of merchantable quality, did not produce dangerous side effects, and was adequately tested and fit for its intended use.

311.    The port does not conform to the Defendants' express representations because it is not reasonably safe, has numerous serious side effects, and causes severe and permanent injury.

312.    Defendants further breached express representations and warranties made to Plaintiff, her physicians and healthcare providers with respect to the port implanted in Plaintiff in the following respects:

a.  Defendant represented to Plaintiff's Decedent and her physicians and healthcare providers through labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions among other ways that the Defendants' port was safe, meanwhile Defendant fraudulently withheld and concealed information about the substantial risks of serious injury associated with using the port;

b.  Defendants represented to Plaintiff's Decedent and her physicians and healthcare providers that the Defendants' port was as safe and/or safer than other alternative procedures and devices then on the market, but fraudulently

40

concealed information that demonstrated that port was not safer than alternative therapies and products available on the market; and

c. Defendants represented to Plaintiff's Decedent and her physicians and healthcare providers that the port was more efficacious than other alternative procedures, therapies and/or devices. Meanwhile, Defendants fraudulently concealed information, regarding the true efficacy of the port.

313. At all relevant times, the port did not perform as safely as an ordinary consumer would expect, when used as intended or in a reasonably foreseeable manner.

314. Plaintiff's Decedent, her physicians, and the medical community reasonably relied upon the Defendants' express warranties for the port.

315. Privity exists between Plaintiff's Decedent and her physicians because Plaintiff's Decedent's physicians acted as Plaintiff's Decedent's purchasing agents in the subject transaction and/or because Plaintiff was a third-party beneficiary of the subject contract.

316. Plaintiff's Decedent was the intended consumer of the device when Defendant made the warranties set forth herein, and such warranties were made to benefit Plaintiff's Decedent as a patient and consumer.

317. Plaintiff's Decedent was intended consumer of the port when Defendant made the warranties set forth herein, and such warranties were made to benefit Plaintiff's Decedent as a patient and consumer.

318. At all relevant times, the port was used on Plaintiff's Decedent by her physicians for the purpose and in the manner intended by Defendants.

319. Plaintiff's Decedent and her physicians, by the use of reasonable care, could not have discovered the breached warranty and realized its danger.

41

320. As a direct, actual, and proximate cause of the Defendants' express warranties, Plaintiff has suffered, and will continue to suffer, severe physical pain and injuries which are permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical and nursing expenses, surgical expenses, and economic loss as alleged herein. These damages have occurred in the past and will continue into the future.

321. Upon information and belief, Plaintiff's Decedent's healthcare providers sent notice to Defendants of the adverse event that occurred to Plaintiff's Decedent and thus, the nonconformity of the port, within a reasonable period of time following discovery of the breach of warranty and before suit was filed.

### COUNT VI: FRAUDULENT CONCEALMENT
(Against Defendants AngioDynamics, Navilyst, PFM Medical, ICU Medical Inc., Becton, Dickinson and Company; C.R. Bard, Inc.; Bard Access Systems, Inc.; Bard Peripheral Vascular, Inc.)

322. Plaintiffs incorporate the preceding paragraphs as if set out fully herein.

323. Defendants made false statements and representations to Plaintiff's Decedent and her healthcare providers concerning the port product implanted in Plaintiff's Decedent.

324. Defendants engaged in and fraudulently concealed information with respect to the port in the following respects:

325. Defendants represented through the labeling, advertising, marketing materials, seminar presentations, publications, notice letters, and regulatory submissions that the port was safe and fraudulently withheld and concealed information about the substantial risks of using the port, including, but not limited to, its heightened propensity to precipitate thromboembolism and cause complications;

326. Defendants represented that the port was safer than other alternative systems and fraudulently concealed information which demonstrated that the port was not safer than

alternatives available on the market;

327. Defendants concealed that it knew of the port's dangerous propensity to precipitate thromboembolism and was causing complications from causes other than the manner in which the implanting physician implanted the device; and

328. That frequency of these failures and the severity of injuries were substantially worse than had been reported.

329. Defendants had knowledge that the representations they made concerning the port, as stated above, were false.

330. Defendants had sole access to material facts concerning the dangers and unreasonable risks of the port.

331. The concealment of information by the Defendants about the risks of the port was intentional.

332. The concealment of information and the misrepresentations about the port was made by the Defendants with the intent that Plaintiff's Decedent health care providers and Plaintiff's Decedent rely upon them.

333. Plaintiff and her physicians relied upon the representations and were unaware of the substantial risks of the port which the Defendants concealed from the public, including Plaintiff and her physicians.

334. As a direct and proximate result of the Defendants' actions, omissions and misrepresentations, Plaintiff's Decedent has suffered, physical pain and injuries which are permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical and nursing expenses, surgical expenses, death, and economic loss as alleged herein. These damages have occurred in the past and will continue into the future.

335. The Defendants acted with oppression, fraud, and malice towards Plaintiff's Decedent, who accordingly requests that the trier of fact, in the exercise of its sound discretion, award additional damages for the sake of example and for the purpose of punishing Defendants for their conduct, in an amount sufficiently large to be an example to others, and to deter this Defendants and others from engaging in similar conduct in the future.

336. Had Defendants not concealed this information, neither Plaintiff's Decedent nor her health care providers would have consented to using the device in Plaintiff's Decedent.

## COUNT VII: OHIO CONSUMER SALES PRACTICES ACT
(Against Defendants AngioDynamics, Navilyst, PFM Medical, ICU Medical Inc., Becton, Dickinson and Company; C.R. Bard, Inc.; Bard Access Systems, Inc.; Bard Peripheral Vascular, Inc.)

337. Plaintiff incorporates the preceding paragraphs as if set out fully herein.

338. Plaintiff's Decedent was a consumer who purchased the port, and the product was intended for personal use.

339. The acts and practices engaged in by Defendants as outlined above constitute unlawful, unfair, and/or fraudulent business practices in violation of Ohio Rev. Code Ann. § 1345.01 et seq.;

340. Defendants engaged in unlawful practices including deception, false promises, misrepresentation, and/or the concealment, suppression, or omission of material facts in connection with the sale, distribution, and/or advertisement of the port in violation Ohio Rev. Code Ann. § 1345.03;

341. Plaintiff's Decedent purchased the port, a product that was falsely represented, as further set forth herein, as having certain characteristics and benefits it did not have, inter alia, that it was reasonably safe for use, as further set forth above, in violation of the Ohio Consumer Sales Practices Act.

44

342.    Defendants further knowingly or recklessly engaged in unfair, unconscionable, deceptive, deliberately misleading, false, and/or fraudulent and deceptive acts and practices, all in violation of the Ohio Consumer Sales Practices Act, and as further described herein, which created a likelihood of confusion or misunderstanding on Plaintiff's Decedent part with respect to the port she purchased, including, but not limited to, misrepresenting that the port was reasonably safe for use and failing to adequately disclose the substantial risk of infection, and harm the product entailed given the large number of adverse events Defendants knew or should have been aware of but did not adequately disclose to Plaintiff's Decedent.

343.    Defendants' practices were likely to mislead consumers who acted reasonably to their detriment in purchasing the product based on Defendants' representations that it was reasonably safe for use when it in fact was not and had a higher risk of infection due to its defective design.

344.    Defendants intended for Plaintiff's Decedent, her physicians, and other consumers to rely on their deceptive practices and representations in order to continue selling and manufacturing the port.

345.    Plaintiff purchased the port, a product that was falsely represented, as set out above, in violation of the Ohio Consumer Sales Practices Act and as a result Plaintiff suffered economic damages in that the product she purchased was worth less than the product she thought she had purchased had Defendants' representations been true.

## COUNT VIII: WRONGFUL DEATH

346.    .Plaintiff restates the allegations above as if fully rewritten herein.

347.    As a direct and proximate result of Defendants' acts and/or omissions, Plaintiff's Decedent used Defendants' IPCs and ultimately died.

348.    Plaintiff's Decedents are survived by various family members, named and

unnamed.

349. As a direct and proximate result of the defective and unreasonably dangerous condition of Defendants' IPCs and Defendants' acts and/or omissions, Plaintiffs' Decedents' beneficiaries have incurred hospital, nursing, and medical expenses, as well as funeral expenses and estate-administration expenses.

350. As a direct and proximate result of the defective and unreasonably dangerous condition of Bard IPCs and Defendants' acts and/or omissions, Plaintiffs' Decedents' heirs and family have been deprived of Plaintiffs' Decedents' future aid, income, assistance, services, companionship, society, affection, and financial support, and Plaintiffs have suffered Injuries and Damages.

351. Where authorized under relevant state law, Plaintiffs' Decedents' spouses, beneficiaries, administrators, and/or lawful representatives of Plaintiffs' Decedents' estates bring this claim on behalf of themselves and as the Plaintiffs' Decedents' lawful heirs and/or beneficiaries for the Plaintiffs' Decedents' wrongful death.

## COUNT XVI: SURVIVAL

352. Plaintiff restates the allegations above as if fully rewritten herein.

353. As a direct and proximate result of the defective and unreasonably dangerous condition of Defendants' IPCs and Defendants' acts and/or omissions, Plaintiff's Decedent suffered Injuries and Damages prior to Plaintiff's Decedent's death.

354. Where authorized under relevant state law, Plaintiffs' Decedents' spouses, beneficiaries, administrators, and/or lawful representatives of Plaintiffs' Decedents' estates seek all Injuries and Damages that Plaintiff's Decedents suffered as a result of Defendant's IPCs.

## TIMELINESS AND TOLLING OF STATUTES OF LIMITATION AND REPOSE

355. Defendant's actions, including misrepresentations, omissions, and fraudulent

concealment, prevented Plaintiff from discovering the existence of the cause of action. Accordingly, the statute of limitations is tolled under the principles of equitable tolling and the discovery rule.

356.    Plaintiff did not discover, and through the exercise of reasonable diligence could not have discovered, the facts giving rise to the claims set forth herein. As such, under the discovery rule, the statute of limitations is tolled until the date of discovery, and the claims are timely filed.

## **PRAYER**

**WHEREFORE**, Plaintiffs prays for judgment against each of the Defendants as follows:

a.    Judgment be entered against all Defendants on all causes of action of this Complaint;

b.    Plaintiff be awarded her full, fair, and complete recovery for all claims and causes of action relevant to this action;

c.    Plaintiff be awarded general damages according to proof at the time of trial;

d.    Plaintiff be awarded damages, including past, present, and future, medical expenses according to proof at the time of trial;

e.    Plaintiff be awarded costs and attorney's fees in connection with Plaintiff's action under Ohio's Consumer Sales Practices Act under Ohio Rev. Code §1345.01, *et seq*., and Ohio Rev. Code §1345.75.

f.    Awarding pre-judgment and post-judgment interest to the Plaintiff;

g.    Awarding the costs and the expenses of this litigation to the Plaintiff;

h.    For such other and further relief as the court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demands trial by jury on all issues.

Respectfully submitted,

**THE COCHRAN FIRM**

<u>/s/ Melissa Payne</u>
Melissa Payne
Ohio Bar No. 0098027
Danae N. Benton
Texas Bar No: 24080422
Florida Bar: 1002916
Larry Taylor, Jr.
Oklahoma Bar: 34221
New Mexico Bar: 153622
Arizona Bar: 038277
Texas Bar No: 24071156
Dimitri Dube
Texas Bar No: 24068944
Pennsylvania Bar No. 201816
THE COCHRAN FIRM
1825 Market Center Blvd., Suite 500
Dallas, TX 75207
Phone: 214-651-4260
Fax: 214-651-4261
Email: dbenton@cochrantexas.com
ltaylor@cochrantexas.com
ddube@cochrantexas.com
mpayne@cochrantexas.com

***Attorneys for Plaintiff***